20CV00513
Div7

## IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
### CIVIL DIVISION

| | |
|---|---|
| S.G., individually and<br>as guardian of H.C.,<br><br>                        **Plaintiffs,**<br><br>v.<br><br>**SHAWNEE MISSION SCHOOL DISTRICT<br>USD 512,**<br><br>   **Serve: Mr. Michael Fulton**<br>        **Superintendent**<br>        **8200 W. 71st Street**<br>        **Shawnee Mission, KS 66204**<br><br>**AND**<br><br>**HEATHER OUSLEY, SHAWNEE MISSION<br>SCHOOL DISTRICT, USD 512,<br>BOARD OF EDUCATION PRESIDENT**<br><br>   **Serve: 8200 W. 71st Street**<br>        **Shawnee Mission, KS 66204**<br><br>**AND**<br><br>**TEDDI PENDLAND**<br>   **Serve: 31 Sunrise Drive**<br>        **Rancho Mirage, CA 66207**<br><br>**AND**<br><br>**CRYSTAL SMITH**<br>   **Serve: 115 NE 47th Street**<br>        **Kansas City, MO 64116** | Case No.:_____ |

### PETITION

Plaintiff S.G., individually and on behalf of her child, H.C., by and through counsel, and

for their causes of action against Defendants Shawnee Mission School District USD 512,

Heather Ousley, the Shawnee Mission School District USD 512 Board of Education President, Teddi Pendland ("Pendland"), and Crystal Smith ("Smith") state the following:

## Parties, Jurisdiction, and Venue

1.      Plaintiff H.C. ("H.C.") is a minor child whose date of birth is 06/28/2013.  H.C. currently resides in Johnson County, Kansas.  At all relevant times, H.C. was a student at Bluejacket-Flint Elementary School ("Bluejacket-Flint") in Shawnee Mission School District USD 512.

2.      Plaintiff S.G. ("S.G.") is the parent and legal guardian of H.C.  S.G. currently resides in Johnson County, Kansas with H.C.

3.      S.G. brings these causes of action on behalf of her minor daughter, H.C.

4.      Defendant Shawnee Mission School District USD 512 ("SMSD") is a public-school district located in Johnson County, Kansas. The School District is a governmental entity created to provide public education to children within its boundaries.

5.      Defendant Heather Ousley is the Shawnee Mission School District USD 512 Board of Education President ("School Board President") (SMSD and School Board President are collectively referred to herein as "District") is located at 8200 W. 71st Street, Shawnee Mission, KS 66204.  Ousley, as School Board President exercises policymaking authority over the School District.

6.      Upon information and belief, Defendant Teddi Pendland ("Pendland") was principal of Bluejacket-Flint during the 2018-2019 school year and currently resides in Johnson County, Kansas

7.      Upon information and belief, Defendant Crystal Smith was a teacher at Bluejacket-Flint during the 2018-2019 school and currently resides in Johnson County, KS.

8.      Venue and jurisdiction are proper pursuant to K.S.A. § 60-604 and § 60-608 in this court over all Defendants because the causes of action arise from events that took place in Johnson County, Kansas.

9.      Pursuant to the requirements of the Kansas Tort Claims Act, Plaintiffs provided the District with written notice of their intent to sue on May 16, 2019. *See* K.S.A. § 12-105b(d). The District failed to approve Plaintiffs' claims in their entirety within 120 days (*i.e.* by September 13, 2019). Plaintiffs, therefore, have complied with the statutory waiting period prescribed in § 12-105b(d) of the Kansas Tort Claims Act.

## The Event

10.     H.C. was a kindergarten student at Bluejacket-Flint ("Bluejacket") in the Spring 2019 school year.

11.     Upon information and belief, Smith was hired by the District to teach at Bluejacket for the 2018-2019 school year.

12.     Upon information and belief, Smith was previously employed at Kitty Hawk Elementary School in Dare County, North Carolina.

13.     Upon information and belief, the District contacted an administrator at her prior employer to determine if they would re-hire her and the response was "no."

14.     Despite this information, Smith was hired to teach kindergarteners and she was H.C.'s teacher for the Spring 2019 school year.

15.     February 21, 2018 was a Thursday. On that day, H.C. went to school just like any regular school day.

16.     On this particular day, H.C.'s class had the privilege of going to the library.

17.     Smith droped her students off at the library and did not stay with them for library time.

18.   While in the library, H.C. created some artwork for her mother.

19.   After finishing her artwork, H.C. looked for a book to check out.

20.   After finding the book, all of the students helped clean up.

21.   While doing so, H.C. picked up the book she wanted to check out and looked for the artwork she created inside the book (because she thought that was where she placed it).

22.   She could not find it inside of the book so she looked all around the library.

23.   Another child helped her look and, eventually, they found the artwork.

24.   Because it fell on the ground, the artwork was crumbled and this made H.C. upset.

25.   H.C. approached the librarian to show her the damage to the work. It was at that time that Smith reentered the library.

26.   H.C. responded to Smith by going toward the children that were lined up and ready to leave the library.

27.   H.C. did not get into the line and it appears she was told by Smith to stand by the bookshelves, out of line.

28.   H.C. sat on the floor next to the bookshelves.

29.   The other children in H.C.'s class exited the library.

30.   H.C. then crawled into a bookshelf opening and crouched in what appeared to be fear of Smith.

31.   While hiding, Smith continued to speak with the librarian.

32.   Upon completing her conversation, Smith went to the bookshelf and forcefully grabbed H.C. and yanked her out of the bookcase.

33.   Smith then appeared to pin H.C.'s arm behind her back causing H.C. pain.

34.     Smith then stepped away from H.C. and looked to see if anyone was watching her.

35.     Upon information and belief, Smith knew the librarian was at her desk in the library and asked the librarian to contact the principal for assistance.

36.     As the librarian picked up a communication device and turned her back to Smith, Smith forcefully kicked H.C. while she was still lying on the ground in fear.

37.     H.C. continued to lie on the floor in fear as Smith cowered over her.

38.     Smith then stepped away from H.C. and approached her again in an effort to get H.C. to stand up.

39.     H.C. eventually stood up on her own, with arms crossed, and walked out of the library behind Smith.

40.     A video camera captured the entire event.

41.     After the event, S.G. was not contacted to be informed of the event.

42.     Instead, S.G. picked up H.C. from school and H.C. told S.G. what occurred that day at school.

43.     S.G. then went to Bluejacket to get an understanding of the situation that occurred.

44.     S.G. met with Ms. Kaitlin Barnard ("Barnard"). Barnard informed S.G. that H.C. was brought to Barnard's room by Pendland.

45.     Barnard admitted to S.G. that H.C. informed Barnard her teacher hit her arm and hurt her. But Barnard also explained that she was not there and did not know what happened.

46.     Barnard informed S.G. that she took H.C. back to Smith's classroom after H.C. calmed down.

47.     Barnard also informed S.G. that she did not report what H.C. told her to anyone.

48.     S.G. confronted Smith about the event and Smith denied inflicting any harm upon her. Smith informed S.G. that her daughter H.C. was not being truthful, and it was suggested that H.C. may have self-inflicted any harm or marks she had on her arms.

49.     S.G. spoke with the Pendland and requested for the video cameras to be reviewed to attempt to figure out anything. Pendland advised she would review the video cameras to attempt to understand the situation.

50.     There was no suggestion that the video cameras had already been reviewed or that an Emergency Safety Intervention event had been called that required any kind of restraint for H.C.

51.     Pursuant to the District's policies and procedures, "an emergency safety intervention shall be used only when a student presents a reasonable and immediate danger of physical harm to such student or others with the present ability to affect such physical harm."

52.     Prone, or face down, physical restraint is prohibited pursuant to the emergency safety intervention standards.

53.     Despite no evidence to suggest an Emergency Safety Intervention was needed or actually called, S.G. submitted a Release of Records Request Form, which included a request for any Emergency Safety Intervention Reports on March 4, 2019.

54.     S.G. received an email from Pendland on March 4, 2019 which included an Emergency Safety Intervention Report that was dated as written on February 27, 2019, and stated that the Emergency Safety Intervention was done on February 21, 2019.

55.     The letter acknowledged H.C. "didn't do anything to necessitate the intervention." The letter further admitted Smith "took it upon herself to grab [H.C.] by the arms and pull her out of the bookshelf. She then kicked the student."

56.     The letter went on to say Pendland was called for help and Pendland took H.C. to calm down.

57.     The emergency safety intervention protocol mandates the school contact parents on the day of the intervention to inform them of the intervention.

58.     The emergency safety intervention protocol also mandates the parent receive documentation of the intervention by the school day following the event specifically explaining the events that led up to the intervention, all steps taking during the intervention along with all people present and significant explanation regarding the facts of the event.

59.     The District, Pendland and Smith did not follow the mandated protocols of the emergency safety intervention plan, assuming the event qualified as any such intervention.

60.     In fact, nobody attempted to contact S.G. to inform her of this event.

61.     Had H.C. not told S.G. of the event upon being picked up, it is possible that it would have never been reported.

62.     Had S.G. not gone to Bluejacket to investigate and demand answers immediately, it is likely that nobody would have looked at the video cameras ever and H.C. would have returned to school to possibly suffer more abuse at the hands of Smith.

## Policies and Procedures Related to Student Supervision

63.     District enacted a series of policies and procedures governing the care and supervision of children at their facilities.

64.     District Policy  "GAAF" (Emergency Safety Intervention) identifies when an intervention can take place and how it is to be managed. The policy demands all staff members be trained consistent with nationally recognized training programs regarding the use of positive behavioral intervention strategies, de-escalation techniques, and prevention techniques. GAAF also mandates parent communication and almost immediate documentation.

65.    District Policy "GAAD" (Child Abuse Investigation) mandates that as soon as a child is suspected of being abused physically, mentally, or emotionally, the school personnel initially discovering the information is required to immediately contact the Department for Children and Families.

66.    District Policy "GAAE" (Bullying by Staff) prevents any staff member from bullying students and if it occurs, staff members who violate the bullying prohibition shall be reported to local law enforcement.

## COUNT I: VIOLATIONS OF 42 U.S.C. § 1983 FOR DENIAL OF H.C.'S LIBERTY INTEREST IN BODILY INTEGRITY UNDER THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT

### (Plaintiffs v. Defendant Smith)

67.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

68.    Upon information and belief, Defendant Smith was classified as an employee of District (*i.e.* a government entity) during the relevant time period and, therefore, was acting under color of state law.

69.    H.C. has a protected liberty interest in her bodily integrity and to be free from physical assault. This liberty interest, in turn, was clearly established at all times relevant to this Complaint.

70.    Defendant Smith assumed a duty to protect H.C. from unreasonable risks of harm and to act *in loco parentis* while teaching H.C.

71.    H.C.'s right to be free from physical harm from her teacher, Defendant Smith, is clearly established.

72.     Defendant Smith placed H.C. at a significant risk of serious, immediate, and proximate harm when she failed to follow standard procedures to de-escalate a situation and, instead, physically harmed H.C.

73.     The risk of harm to H.C. was known and apparent to Defendant Smith because she had direct knowledge of her responsibility to care for H.C.

74.     In failing to properly intervene, and instead, physically harming H.C. Defendant Smith acted recklessly and with conscious disregard for H.C.'s safety.

75.     As a direct and proximate result of Defendant Smith's actions H.C. suffered physical harm and trauma.

76.     Smith's deliberate indifference to H.C.'s physical well being shocks the conscience.

77.     Smith's actions were intentional, willful, and wanton and displayed a deliberate and callous indifference to H.C.'s federally-protected rights such that H.C. is entitled to an award of punitive damages.

78.     As a direct and proximate result of the Smith's deliberate indifference to known acts of constitutional deprivation, H.C. suffered damages including but not limited to: (1) denial of access to an educational environment free from physical abuse; (2) past, present, and future physical pain and suffering; (3) past, present, and future emotional pain and suffering; (4) mental anguish and loss of enjoyment of life; (5) past, present, and future expenses for physical, emotional, and mental healthcare; and (6) punitive damages to deter the individual Defendants and others from similar conduct in the future.

79.     Plaintiffs are entitled to recover attorney's fees and expenses pursuant to 42 U.S.C. § 1988(b).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant Smith for compensatory and punitive damages, for attorneys' fees and expenses pursuant to 42 U.S.C. § 1988(b), for costs, and for such other and further review that the Court deems fair and equitable under the circumstances.

## COUNT II: VIOLATIONS OF 42 U.S.C. § 1983 FOR DENIAL OF E.G.'S LIBERTY INTEREST IN BODILY INTEGRITY UNDER THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT -- FAILURE TO TRAIN AND SUPERVISE

### (Plaintiffs v. District)

80.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

81.     SMSD is a state entity which, through its employees, acted under color of state law while providing an education to H.C.

82.     Ousley is an elected board member and President of the School Board, in this capacity she acted under color of state law while providing an education to H.C.

83.     Upon information and belief, District failed to adequately train employees on the proper handling of events that require de-escalation or verbal rather than physical assistance in violation of the District's own policies.

84.     The District's failure to adequately train employees on the proper handling of such events and reporting of intervention events reflects a deliberate indifference to the rights of students such that the District's inadequate training/supervision amounts to policy violations.

85.     Adequate training of teachers is necessary to protect school children from acts of violence at school which, necessarily, result in violations of the victim's constitutional rights.

86.     The District's failure to adequately train and supervise staff on the proper handling and reporting of student care represents deliberate indifference to a known pattern of unconstitutional conduct.

87.     As a direct and proximate result of the District's deliberate indifference to known acts of constitutional deprivation, H.C. suffered the following damages: (1) denial of access to an educational environment free from abuse; (2) past, present, and future physical pain and suffering; (3) past, present and future emotional/psychological pain and suffering; (4) mental anguish and loss of enjoyment of life; and (5) past, present and future medical expenses for physical, emotional, and mental healthcare.

88.     Plaintiffs are entitled to recover attorney's fees pursuant to 42 U.S.C. § 1988(b).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against District for compensatory damages, for attorney's fees and expenses pursuant to 42 U.S.C. § 1988(b), for costs, and for such other relief that the Court deems fair and equitable under the circumstances.

## COUNT III -- NEGLIGENT TRAINING/SUPERVISION
### (Plaintiffs v. District and Pendland)

89.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

90.     District and Pendland, as principal of the school, had a legal duty to exercise reasonable care in the hiring, supervision, and training of teachers which it owed to H.C. and other students who have a statutory right to state-furnished education.

91.     District and Pendland breached this duty of care when they failed to adequately train Smith on the proper handling and reporting of student care and de-escalation in intervention situations.

92.     Instead, as a direct and proximate result of the District and Pendland's failure to adequately train and supervise teachers, Smith had free reign to assault H.C. while it was completely ignored by staff, including Pendland, until S.G. demanded answers.

93.     As a result of the assault, H.C. has suffered the following damages:  (1) denial of access to an educational environment free from abuse; (2) past, present, and future physical pain and suffering; (3) past, present and future emotional/psychological pain and suffering; (4) mental anguish and loss of enjoyment of life; and (5) past, present and future medical expenses for physical, emotional, and mental healthcare.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against SMSD, Ousley and Pendland for compensatory damages and for such other relief that the Court deems fair and equitable under the circumstances.

## COUNT IV – NEGLIGENT HIRING
### (Plaintiffs v. SMSD and Pendland)

94.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

95.     Defendants SMSD and Pendland had a legal duty to exercise due care when hiring Smith.

96.     Defendants were on notice that Smith would not have been re-hired by her prior employer and made no effort to look further, instead they simply hired Smith.

97.     As a direct result of hiring Smith, H.C. was the victim of physical harm at the hands of Smith.

98.     As a result of the assault, H.C. has suffered the following damages:  (1) denial of access to an educational environment free from abuse; (2) past, present, and future physical pain and suffering; (3) past, present and future emotional/psychological pain and suffering; (4) mental

anguish and loss of enjoyment of life; and (5) past, present and future medical expenses for physical, emotional, and mental healthcare.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against SMSD and Pendland for compensatory damages and for such other relief that the Court deems fair and equitable under the circumstances.

### JURY TRIAL

Plaintiffs request a jury trial on all claims.

Respectfully submitted,

**DRZ Law, LLC**

/s/ Daniel R. Zmijewski
Daniel R. Zmijewski   KS #21275
Christopher Dove      KS #21251
8700 State Line Rd., Suite 305
Leawood, KS 66206
P: 913-400-2033
F: 816-523-5667
dan@drzlawfirm.com
chris@drzlawfirm.com

*Clerk of the District Court, Johnson County Kansas*
*01/28/20  02:19pm ST*