## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| S.G., individually and as guardian of H.C., | |
| **Plaintiff,** | |
| v. | **Case No. 20-CV-2078-JAR-ADM** |
| SHAWNEE MISSION SCHOOL DISTRICT, USD NO. 512, et al., | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff S.G. brings this school abuse case on behalf of her minor daughter, H.C., asserting failure-to-train and failure-to-supervise claims against Shawnee Mission School District, USD No. 512 ("SMSD") under 42 U.S.C. § 1983 and Kansas common-law negligence.[1] S.G. initially filed this action in Johnson County District Court and Defendants removed the action to this Court.[2]  This matter is now before the Court on SMSD's Motion for Summary Judgment (Doc. 129).  The matter is fully briefed, and the Court is prepared to rule.  For the reasons set forth in depth below, the Court grants summary judgment on Plaintiff's § 1983 claims and declines to exercise supplemental jurisdiction over the state-law negligence claim.

---

[1] Plaintiff's claims against Heather Ousley, President of SMSD Board of Education, and Principal Teddi Pendland were voluntarily dismissed; Plaintiff ultimately settled her claims against Crystal Smith.  *See* Docs. 20, 81, 85, 88, 94.  The Court overruled and denied Plaintiff's objections to Magistrate Judge Mitchell's June 30, 2022 Memorandum and Order denying Plaintiff leave to amend the Pretrial Order to add additional allegations related to H.C.'s Individual Education Program ("IEP").  Doc. 124.

[2] Doc. 1.

## I.      Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[8]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party

---

[3] Fed. R. Civ. P. 56(a).

[4] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[13]  A genuine issue of material facts must be supported by "more than a mere scintilla of evidence."[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  "At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences."[16]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted, stipulated, or viewed in the light most favorable to Plaintiff.  The Court excludes evidence offered through affidavits and deposition testimony that would not be admissible at trial, including evidence that is not relevant,[17] evidence that is hearsay for which no exception to the hearsay rule is apparent,[18] and

---

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[12] *Adler*, 144 F.3d at 671.

[13] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[14] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16] *Bacon v. Great Plains Mfg., Inc.*, 958 F. Supp. 523, 526 (D. Kan. 1997) (citation omitted).

[17] Fed. R. Evid. 401.

[18] Fed. R. Evid. 801–807.

evidence that is not based on the witness's personal knowledge.[19]   Furthermore, the Court disregards conclusory allegations without specific supporting facts that do not have probative value[20] and "statements of mere belief."[21]   The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.   Nor does the Court consider legal arguments included in the parties' statements of fact.

### *The Actors*

SMSD is a unified school district and governmental subdivision of the State of Kansas, duly organized and existing pursuant to Article 6, § 5 of the Constitution of the State of Kansas and K.S.A. 72-1131, *et seq*.   SMSD is governed by its duly elected Board of Education.[22]

Plaintiff S.G. is H.C.'s mother.   H.C. attended preschool and kindergarten in another school district and was moved to SMSD because it was a bigger district and had more staff and support staff for special education services and children with exceptionalities.   H.C. enrolled in SMSD and began attending Bluejacket-Flint Elementary School ("Bluejacket-Flint") as a kindergarten student on February 6, 2019.

Teddi Pendland Blackim ("Pendland") was the principal at Bluejacket-Flint in February 2019.   Pendland was a principal in the USD No. 512 district for eighteen years.   She has a bachelor's degree in business marketing and elementary education, and a master's degree in educational administration.

Kaitlin Barnard was a special education teacher working at Bluejacket-Flint in February 2019.

---

[19] Fed. R. Evid. 602.

[20] *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1143 (10th Cir. 2005) (citations omitted).

[21] *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[22] K.S.A. §§ 72-1138 and 72-3216.

Sheryl Cantwell has worked as a school teacher or librarian for thirty-one years. She has been a librarian at Bluejacket-Flint for sixteen years.

Dr. Doug Sumner was associate superintendent of Human Resources in February 2019.

Crystal Smith was H.C.'s teacher at Bluejacket-Flint. Smith began working for SMSD as a teacher in September 2017. According to Sumner, Smith worked in another elementary school in the district and was transferred to Bluejacket-Flint because of changing enrollment numbers. Prior to her employment with SMSD, Smith worked in North Carolina as a teacher and by 2019, had twenty-two total years of teaching experience. Pendland never received a complaint about Smith from other teachers, or from parents, about the way Smith treated their children. Sumner also never heard any prior concerns about Smith.

### The Incident

February 21, 2019 was H.C.'s fifth day in Smith's classroom. That day, Smith and her students were in the school library.

The security camera in the library recorded what transpired that day. The Court has reviewed the approximately six-minute long silent video.[23] The video shows H.C. wandering around the library looking for something for nearly four minutes while Cantwell had the rest of the class lined up to leave the library to go back to their classroom. While Cantwell is speaking to H.C., Smith enters the video. Smith asked H.C. to get in line with the other students but instead, H.C. walked toward a bookshelf next to where the class was lined up. As the class leaves the library, Cantwell and Smith speak with each other. H.C. goes behind the back of a bookshelf where Smith could not see her and then slides onto the bookshelf and lies down on her back. While Cantwell walks across the library to her office area, Smith goes to the bookshelf,

---

[23] Doc. 137-B (filed under seal).

grabs H.C. by the arm, and pulls her out of the bookshelf onto the floor.  Smith holds H.C. down while the child cries, kicks, and rolls into a ball.  Smith stands up and briefly walks away from H.C., but returns and tells Cantwell to call the office for assistance because H.C. kicked Smith. Cantwell, who is still in her office area, turns her back to Smith and walks away from her while speaking on the walkie-talkie.  While Cantwell is walking away from her, Smith kicks H.C. in her back.  Cantwell then crosses back from her office and leaves the library.  H.C. eventually follows Smith out of the library, where they were met by Pendland in the hallway.  Meanwhile, Smith's students had returned to their classroom without an adult or teacher.  Approximately two minutes transpires from the time Smith enters the library and when she and H.C. leave the library.

The actors give varying accounts of what happened that day.  Cantwell testified that as the students were lining up at the end of library class, H.C. came to her and said she could not find the drawing she made during class and Cantwell told her she could look around the library. When Smith returned to the library, Cantwell told her why H.C. was upset.  Cantwell explained that she was walking toward her desk when Smith removed H.C. from the bookcase, that she was unaware that H.C. was in the bookcase, and that she could not see behind the bookcase from her location in the library.  Smith told Cantwell that H.C. had kicked her and asked Cantwell to call the office for help.  Cantwell testified that her back must have been turned away from Smith and H.C. when Smith kicked the child.  After Cantwell called the office, she put down the walkie-talkie and walked out of the library because she realized that Smith's students may be unattended in their classroom and she knew that Pendland was on her way to the library.  She did not learn that Smith kicked H.C. until the next month.

Pendland was in a meeting when Cantwell contacted her on her walkie-talkie to request

assistance with a student.  When Pendland arrived at the library, Smith and H.C. were walking

out of the library and to the hallway.  Pendland testified that H.C. was crying and upset when she

first saw her in the hallway.  Pendland took H.C.'s hand and walked her to the special education

room.  She did not ask Smith if something happened during this initial meeting and could not

remember if anything at all was said between them.  Pendland left H.C. with Barnard in the

special education room so Pendland could return to her meeting.  She testified that she had no

understanding of what had occurred in the library at that time.

     Barnard confirmed that H.C. was visibly upset and crying, and hysterically screamed "all

sorts of things," including, "my teacher hit me."[24]  When Barnard took H.C. to the calm corner

and gave her Play-Doh to play with, H.C. immediately stopped crying.  After H.C. calmed down,

Barnard asked H.C. what made her upset and H.C. said that a boy had taken her paper.  H.C.

asked if she could go back to class and Barnard took her back to Smith's classroom.  Barnard

stayed with H.C. in the classroom for approximately five minutes and did not observe any

problems with the way H.C. was interacting with Smith.  Barnard asked H.C. if she was okay

before she returned to her own classroom.  After her meeting was over, Pendland returned to

Barnard's classroom to check on H.C. and Barnard told her that H.C. had calmed down and

asked to return to her class.  Barnard never noticed any injury to H.C. while H.C. was in the

calming area, but did not look for any kind of marks.

     When S.G. picked up H.C. from school, H.C. reported to her that Smith had hit her on her

arm.  She took H.C. home where she showed S.G. red marks on her arm as well as a couple of

spots on her legs.  S.G. called the school and told the person who answered the phone at the front

desk that H.C. reported her teacher had hit her and that she needed to speak with the principal.

---

[24] Doc. 132-3 (filed under seal).

She left a message for Pendland, who was in a meeting, but called back a few minutes later to see if there was anyone else she could speak with.  S.G. decided to return to the school and spoke with Barnard, who reported that H.C. told her that her teacher had hurt her or hit her on the arm. Pendland joined the meeting and told S.G. that there had been an Emergency Safety Intervention and that she did not know what happened but that she was called to help intervene and escorted H.C. to the resource room.  Cantwell then joined the meeting and explained that the students had drawn pictures and that H.C. was upset because she could not find hers, and when Smith came in H.C. did not want to get into line with the other kids.  S.G. testified that Cantwell said she did not hear or see anything because she left to go use the restroom.

S.G. and Pendland then met with Smith, who told them that H.C. was throwing books and metal dividers from the library shelves and that she would not be surprised if H.C. had red marks on her body because she was throwing herself into furniture.  Smith also told Pendland and S.G. that H.C. had kicked Smith.  After Smith left, Pendland told S.G. that an investigation would be conducted.

### The Aftermath

Pendland contacted Human Resources and requested videos, which she accessed the following morning.  After she viewed the video of the incident, Pendland determined that Smith was not going to be allowed to be around students again at the school.  On February 22, 2019, SMSD removed Smith from her teaching duties as a result of her conduct toward H.C.  Smith never returned to Bluejacket-Flint.

S.G. did not take H.C. to school the day after the incident with Smith.  Pendland told her that Smith was on leave and that Pendland had reviewed the video footage and that the statements Smith made about the incident were not true.  Pendland also told S.G. that Smith had

been suspended because of her actions with H.C.

The school reported the incident to the police and a police officer met with S.G. to make a report.  S.G. testified that "at first," SMSD officials worked with her to return H.C. to school, but ultimately H.C. did not return to school in SMSD that semester.

SMSD terminated Smith's employment effective March 25, 2019.  Smith was charged with misdemeanor battery in Johnson County District Court and ultimately pleaded guilty to one count of battery, a class B person misdemeanor.

On February 27, 2022, Sumner met with S.G. and showed her the video from the library incident.  That day, a "Parent Notification Letter—Emergency Safety Intervention" was sent to S.G. about the incident.[25]

Dr. Lachelle Siggs, SMSD Director of Human Resources, sent Pendland an email outlining her concerns about the incident and the next steps to take.  After reviewing the video multiple times, Siggs expressed to Pendland her concern that Cantwell was aware of and could see Smith standing over H.C. in a heated exchange, but did not come over to offer assistance or help de-escalate the situation.[26]  Sumner initially had concerns about Cantwell's view of the incident, but his opinion changed after meeting with Pendland and reviewing the video.[27]  His final conclusion was that he did not think Cantwell knew what was happening after Pendland explained that the camera angle was bad and how the bookshelves were laid out.[28]

On March 22, 2019, Pendland prepared a Summary of Concern for Cantwell.[29]  With

---

[25] Doc. 131-6.

[26] Doc. 136-5.

[27] Doc. 131-7 at 29:3–30:6.

[28] *Id.* at 29:18–21.

[29] Doc. 136-4.

respect to future expectations, the Summary stated: "It is the expectation that whenever a teacher is in a challenging situation, while students are under your care or transitioning, you stay present to either supervise their class or assist with the student that is experiencing challenging behavior."[30]  Pendland testified that she disagreed with the position Human Resources was taking and "thought given the situation that Mrs. Cantwell did the best she could do in that situation."[31]  She explained that she prepared the Summary of Concern because Human Resources told her to do so.

Siggs also expressed concerns about Barnard's actions, and stated in the email to Pendland that

> [A]ny report (by any child) of a student being struck (especially by an adult) should receive immediate attention.  In this case, however, S.G. indicates that Ms. Barnard comforted her daughter after she made the allegation, but then, sent her back to the teacher she reported hit her.  If true, this would be a significant lapse of judgment and potentially place the student in harm's way.[32]

Barnard also received a Summary of Concern from Pendland that stated:

> It is the expectation that whenever a student reports to you that they have been harmed in the building, it is your responsibility to keep that student safe until further determination has been made. In this case, you sent the student back into the classroom where the adult did previously harm the student.  First, gather more information from the student, so that an investigation can occur immediately.  Secondly, report the facts to the principal, while keeping the student in your care.  Thirdly, call the parent immediately to report what their child reported to you.[33]

Finally, Siggs expressed a need for future staff training:

---

[30] *Id.*

[31] Doc. 131-2 at 37:11–13.

[32] Doc. 136-5 at 3.

[33] Doc. 136-7.

> Based on these recent events, there is a need for all staff to be trained (and re-trained) on the appropriate steps to be taken if/when a student reports any type of physical altercation/interaction with another student or staff member.  Again, they should isolate the child from the other student(s) or staff member and immediately contact the office.  When, and only when you (or another support staff member, i.e. social worker, school psych etc.), has taken the child to gather his/her report, should they let the student out of their supervision.  Likewise, training on behaviors and what constitutes a truly "unsafe" behavior is warranted.  Based on the video footage, [H.C.'s] behavior was not unsafe nor did it even warrant an office referral.  Rather, many options (letting her lay in the bookcase until she was calm, sitting next to her on the floor and getting "on her level" to hear her concern, providing space and a set amount of time for her to move to her cool down area in Ms. Barnard's classroom etc.) could have been implemented to support her.  I certainly don't want to infer that your entire staff would have handled her behavior in the same manner we witnessed, but the lack of response by another adult in the room leads me to believe there is an awareness/training concern as well.[34]

Pendland admitted that the school subsequently scheduled non-violent crisis prevention/intervention training because, other than special education and paraprofessionals, the rest of the staff had not received this type of training.  She conceded that the point of such training was "in hopes of this event not occurring again," but could not say for certain that with further training, the incident would not have happened in the first place.[35]

After the incident, Pendland reviewed video of Smith's interactions with students on prior occasions on the bus and discovered Smith had put her hands on another student.[36]  Had Pendland seen the video while Smith was still employed at SMSD, she "probably would have done some disciplinary actions, just based on her behavior . . . [o]n the bus."[37]

---

[34] Doc. 136-5 at 5.

[35] Doc. 131-2 at 90:10–23.

[36] *Id.* at 70:2–3.

[37] *Id.* at 80:1–6.

11

### SMSD Policies and Training

SMSD maintains policies prohibiting or addressing physical contact with students.  Its Board Policy GAAD in effect in February 2019 mandated school personnel to report all situations where sexual, physical, or emotional abuse of students were concerned.[38]  The Board Policy GAAF outlined the proper methods of implementing Emergency Safety Interventions ("ESI"), specifically seclusion and physical restraint, with a student:

> ESI shall be used only when a student presents a reasonable and immediate danger of physical harm to such student or others with the present ability to effect such physical harm.  Less restrictive alternatives to ESI, such as positive behavior interventions support, shall be deemed inappropriate or ineffective under the circumstances by the school employee witnessing the student's behavior prior to the use of any ESI.  The use of ESI shall cease as soon as the immediate danger of physical harm ceases to exist.  Violent action that is destructive of property may necessitate the use of an ESI.[39]

Prohibited types of restraint include use of face-down (prone) and face-up (supine) physical restraint; restraint that obstructs a student's airway or impacts a student's primary mode of communication; chemical restraint, except as prescribed; and mechanical restraint, except protective or stabilizing devices required by law, any device used by a certified law enforcement officer, or seatbelts or other safety equipment used to secure students during transportation.[40]

The GAAF requires that

> All staff members shall be trained regarding the use of positive behavioral intervention strategies, de-escalation techniques, and prevention techniques.  Such training shall be consistent with nationally recognized training programs on ESI. . . .  Administrators, licensed staff members, and other staff deemed most likely to need to restrain a student will be provided more

---

[38] Doc. 130-2.

[39] Doc. 130-3 at 2.

[40] *Id.*

intense training than staff who do not work directly with students in the classroom.[41]

Should an ESI occur, the GAAF provides that "[t]he principal or designee shall notify the parent, the same day as an incident," and "[d]ocumentation of the ESI used shall be provided to the student's parents no later than the school day following the incident."[42]

Board Policy JDA prohibits corporal punishment as a means to maintain order in the school district or as a means of disciplining or correcting students.

SMSD's Code of Conduct sets forth an expectation that all interactions by staff, students, parents, and community members be conducted with professionalism, courtesy, dignity, and respect both on and off school grounds. Behaviors that are prohibited include those that are coercive, intimidating, violent, or harassing. SMSD's Safe Schools goal is to provide an emotional and physically safe environment for each child.

Board Policy GAAE prohibits bullying in any form by any student, staff member, or parent towards a student or by a student, staff member, or parent towards a staff member on or while using school property. Staff members who bully others in violation of this policy may be subject to disciplinary action up to and including termination.

The Agreement between SMSD Board of Education and The National Education Association of Shawnee Mission provides that a teacher's employment contract can be terminated for just cause.

Smith, Cantwell, Pendland, and Barnard, along with all other building staff, received ESI training on August 7, 2018.[43] There are no details in the record describing what the training

---

[41] *Id.* at 3.

[42] *Id.*

[43] Doc. 141-2.

covered.  Smith does not recall receiving any training for positive behavioral intervention or de-escalation while she was at SMSD.[44]  She sought out help from administration and staff on methods to assist with H.C.'s behavior in the classroom, but did not receive any help or advice before the library incident.[45]  She conceded that she had never received training with regard to ESIs over the course of her career that would suggest that an appropriate intervention was to kick a student.[46]

Cantwell testified that she received ongoing training on positive behavior intervention, but could not recall the specifics of that training.[47]  Pendland similarly testified that while she received training provided by SMSD, she does not recall the title or names of the training.

## III.  Analysis

S.G. claims that SMSD violated H.C.'s liberty interest in bodily integrity under the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 as a result of SMSD's failure to train Smith, Cantwell, and Barnard on SMSD's policies and Cantwell's failure to supervise the interaction between Smith and H.C.  S.G. also brings a common-law negligence claim against SMSD for failing to exercise reasonable care in supervising and training teachers in the proper handling and reporting of situations involving de-escalation, as well as a failure by SMSD to properly supervise H.C. while in its care.  SMSD argues that both claims fail as a matter of law.  As discussed below, the Court grants SMSD summary judgment on S.G.'s § 1983 claims and declines to exercise supplemental jurisdiction over her state-law negligence claim.

---

[44] Doc. 131-5 at 18:15–20; 19:5–16.

[45] *Id.* at 21:14–24.

[46] Doc. 130-15 at 77:12–18.

[47] Doc. 131-1 at 59:22–60:24.

## A.        Section 1983

42 U.S.C. § 1983 makes a defendant liable if, under color of state law, the defendant deprives a person of a constitutional right.  Because SMSD is a public school district, the municipal-liability framework applies.[48]  The Supreme Court instructs that under this framework, "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation."[49]  "The absence of an affirmative answer to either of these questions is fatal to a claim against the municipality."[50]

### 1.        Substantive Due Process Violation

S.G. premises her § 1983 claim on the allegation that SMSD failed to train and supervise Smith, Cantwell, and Barnard, which resulted in a violation of H.C.'s liberty interest in bodily integrity under the Due Process Clause of the Fourteenth Amendment.[51]  "Substantive due process protects citizens against arbitrary governmental deprivations of their rights—including the 'right to bodily integrity.'"[52]  "[C]laims of substantive due process brought under the Fourteenth Amendment are analyzed under the 'shock the conscience' standard."[53]  "To satisfy the 'shock the conscience' standard, the plaintiff must demonstrate 'a degree of outrageousness

---

[48] *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010).

[49] *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).

[50] *Id.*

[51] Pretrial Order, Doc. 116 at 6.

[52] *J.L. v. Royal Valley U.S.D. 337*, No. 19-cv-2651-TC, 2021 WL 4197720 at *7 (D. Kan. Sept. 15, 2021) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)).

[53] *Holloman v. Unified Sch. Dist. 259*, No. 05-1180-JTM, 2006 WL 1675932, at *6 (D. Kan. June 15, 2006) (quoting *Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1279 (D.N.M. 2002)).

and a magnitude of potential or actual harm that is truly conscience shocking.'"[54]  Whether specific conduct shocks the conscience is a question of law for the court.[55]

The Tenth Circuit has held that a form of the shocks-the-conscience test applies to all school discipline cases, not just those based on corporal punishment:

> [T]he substantive due process inquiry in school corporal punishment cases [asks] whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.[56]

SMSD argues that Smith, Cantwell, and Barnard's actions did not rise to the level of a due process violation.  S.G. responds that SMSD is confused on the claims being pursued and stresses that she is not alleging a due process claim, but a failure to train and supervise claim.[57]  But it is S.G. that appears to be confused—since S.G.'s § 1983 claim is asserted against a municipality, she must demonstrate that H.C.'s harm was caused by an underlying constitutional violation, and that SMSD is responsible for that violation.[58]  This is so because § 1983 does not confer any substantive rights and a plaintiff must premise her claims on rights found in the

---

[54] *Id.* (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)).

[55] *See Perez v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005) (citing *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005)); *Uhlrig*, 64 F.3d at 573 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992) (explaining that the standard for judging a substantive due process claim is whether the challenged government action would shock the conscience of federal judges)).

[56] *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 786–87 (10th Cir. 2013) (quoting *Garcia v. Miera*, 817 F.2d 650, 655 (10th Cir. 1987)); *Harris v. Robinson*, 273 F.3d 927, 931 (10th Cir. 2001) (applying *Garcia* to a teacher who made a student unclog a toilet with his bare hands).

[57] Doc. 131 at 31–32.

[58] *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)); *J.L. v. Royal Valley U.S.D. 337*, No. 19-cv-2651-TC, 2021 WL 4197720 at *7 (D. Kan. Sept. 15, 2021) (first citing *Myers v. Okla. City Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998), and then citing *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80 (1986)).

Constitution or a federal statute.[59]  Thus, SMSD's purported failure to train and supervise its employees is not the constitutional violation, but the theory of liability by which SMSD may be held responsible for its custom or policy that caused the injury alleged.[60]  While S.G. appears to suggest that she can prevail on her § 1983 claim by merely establishing a municipal custom or policy in the nature of an alleged failure to train or supervise, there is simply no such § 1983 claim independent of the underlying due process clause or other unpled constitutional violation. Because no municipal liability can lie without an underlying constitutional violation, summary judgment is proper on Plaintiff's § 1983 claim on this ground alone.

Nonetheless, SMSD admits that the alleged actions by three employees are prohibited by SMSD policy: Smith physically grabbed and kicked H.C. after pulling her out of a bookcase, conduct both criminal and a terminable offense; Cantwell failed to supervise or intervene in the interaction between Smith and H.C.; and Barnard returned H.C. to Smith's classroom after H.C. told Barnard that Smith had hit her.  SMSD argues that however egregious the actions of Smith, Cantwell, or Barnard may have been, they do not rise to the level of conscience shocking.  The Court disagrees in part.

There is no question that Smith's conduct is disturbing—she kicked a kindergartner in the back after roughly pulling her out of a bookshelf and while the child was still lying on the floor. The Court finds that Smith's reaction to H.C.'s apparent tantrum was disproportionate to the need presented.  Moreover, taken in context and viewed in the light most favorable to S.G., Smith acted with malice—she falsely reported that H.C. had kicked her when she asked Cantwell

---

[59] *See Sturdivant v. Fine*, 22 F.4th 930, 935 (10th Cir. 2022); *Albright v. Oliver*, 510 U.S. 266, 270 (1994); *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

[60] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

to call the office for help and then waited until the librarian had her back turned before she kicked H.C.  Compared to Tenth Circuit precedent holding that use of force on a student fell short of unconstitutional, this case involves conduct that shocks the conscience.[61]  Although the single blow required no medical attention, kicking a child of such a vulnerable age makes Smith's conduct "sufficiently disproportionate, outrageous, and potentially harmful that a reasonable trier of fact could find it conscience shocking."[62]

By contrast, the Court's conscience is not shocked by Cantwell's failure to act to intervene with Smith and H.C. in the library or Barnard's decision to return H.C. to Smith's classroom.  The Tenth Circuit has stated that the "shocks the conscience" standard requires "a high level of outrageousness," requiring something more than negligent, reckless, or even intentional conduct.[63]  While it is true that Cantwell failed to intervene, the fact that Smith kicked the child when Cantwell's back was turned to call the office for assistance decreases the shocking nature of Cantwell's conduct.  Likewise, while Barnard should not have returned H.C.

---

[61] *See, e.g., Muskrat*, 715 F.3d at 786–88 (holding that an unprovoked "pop" to the student's cheek did not shock the conscience for purposes of a Fourteenth Amendment violation where there was no evidence that the act was a brutal and inhumane abuse of official power*); Holloman v. Unified Sch. Dist. 259*, No. 05-1180-JTM, 2006 WL 1675932, at *7 (D. Kan. June 15, 2006) (holding that a "single slap from a teacher that left no scars and required no medical attention does not amount to a substantive due process claim," noting that slap appeared to be "an unwise level of force that was inappropriate and regrettable."); *Valdez ex rel. K.D. v. Salipan*, No. 21-CV-990-WJP-JFJ, 2022 WL 774064, at *3 (D.N.M. Mar. 14, 2022) (finding teacher's unprovoked kick to student's crotch area did not shock the conscience; while condemnable, kick lasted a short duration and left no permanent injuries); *cf. Scott v. Mid-Del Schs. Bd. of Ed.*, 724 F. App'x 650, 654–55 (10th Cir. 2018) (allegations that teacher caused numerous physical injuries to student by hitting him with bathroom-stall door and pushing him back against the stall sufficient to allege claim of conscience-shocking behavior); *Garcia*, 817 F.3d at 652–53 (finding a substantive due process violation where a principal paddled a nine-year-old girl upside down with a split paddle, bloodying the girl's clothing and leaving a permanent scar); *Saunders ex rel. R.S. v. U.S.D. 353 Wellington*, No. 19-2538-DDC-TJJ, 2021 WL 1210019, at *25 (D. Kan. Mar. 31, 2021) (finding claim that teachers repeatedly dragged and applied pressure points to a child with a number of physical and mental disabilities that made him particularly vulnerable were sufficient to allege violation of student's substantive due process rights that shocked the conscience); *G.V.R. ex rel. M.V.R. v. Espanola Public Schs.*, No. CIV 18-0324 KBM/SCY, 2018 WL 4401724, at *7 (D.N.M. Sept. 14, 2018) (finding claim that teacher punched student with enough force to dislocate his shoulder sufficient to allege violation that shocked the conscience).

[62] *Saunders*, 2021 WL 1210019, at *25.

[63] *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222–23 (10th Cir. 2006).

to Smith's classroom in the wake of the child's accusations against her teacher, there is no evidence that Barnard acted with malice.  The record shows that H.C. said many things when she arrived at Barnards' classroom and quickly calmed down in the calm corner.  When calm, H.C. told Barnard that she was upset over a boy taking her paper in the library.  After taking H.C. back to Smith's classroom, Barnard stayed for a few minutes to make sure H.C. was alright.  The Court "may rightly condemn it, but [these actions do] not rise to the level of a constitutional tort."[64]

Accordingly, the Court turns to the second element of Plaintiff's § 1983 claim—whether SMSD is responsible for Smith's underlying constitutional violation.

### 2.     Municipal Liability

"Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers."[65]  A "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."[66]  "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[67]  "Instead, 'the government as an entity' may only be held liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent the official policy, inflicts the injury.'"[68]  Thus, to establish municipal liability, a plaintiff must: (1) demonstrate a municipal policy or custom; (2) establish "a direct causal link between the policy or custom and the injury alleged";

---

[64] *Muskrat*, 715 F.3d at 787.

[65] *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alterations and internal quotation marks omitted).

[66] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[67] *Id.* at 691.

[68] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694).

and (3) "demonstrate that the . . . action was taken with 'deliberate indifference' as to its known or obvious consequences."[69]

With respect to the first element, in addition to promulgated policies or decisions, a municipal policy or custom can be "the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused."[70]

As to the second element of establishing a direct causal link, if "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[71]  "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."[72]

Finally, for claims of inadequate training, or other supervisory practices, a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[73]  The Supreme Court has explained that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[74]  This is so because "[a] less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities.'"[75]  "The

---

[69] *Id.* at 1284 (first quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010); and then quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

[70] *Id.* (quoting *Bryson*, 627 F.3d at 788).

[71] *Brown*, 520 U.S. at 405.

[72] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (citation omitted).

[73] *Brown*, 520 U.S. at 407 (citation omitted).

[74] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Brown*, 520 U.S. at 410).

[75] *Id.* at 62 (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[76]  "In most instances, notice can be established by proving the existence of a pattern of tortious conduct."[77]  Deliberate indifference "may be found absent a pattern of unconstitutional behavior" only in "a 'narrow range of circumstances'" where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."[78]

With this legal background in mind, the Court considers S.G.'s theories of liability.[79]  As explained below, the Court concludes that S.G. has failed to establish that SMSD acted with deliberate indifference to any known deficiency in either its training or supervision as required to establish municipal liability.

### a.        Failure to Train

S.G. argues that SMSD's GAAF is an express policy to protect H.C.'s constitutional rights and that SMSD failed to train Smith on how to enact SMSD's ESI policy, specifically de-escalation tactics.  S.G. further alleges that SMSD only partially followed the policy by calling for an ESI but then failing to document anything or to immediately contact H.C.'s parents, as mandated by the policy.

The Court concludes that the record does not support a finding of deliberate indifference by SMSD.  S.G.'s allegations do not identify any prior incidents of Smith's conduct that would

---

[76] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

[77] *Barney*, 143 F.3d at 1307.

[78] *Id.* at 1307–08 (quoting *Brown,* 520 U.S. at 409).

[79] Failure to train and failure to supervise are treated the same in the Tenth Circuit.  *Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006) (citations omitted).

have put SMSD on the requisite notice of "the existence of a pattern of tortious conduct" toward H.C. or any other students.[80]  Although Pendland observed video of Smith allegedly putting her hands on a different student on a bus trip, she was not aware of this conduct prior to the incident with H.C.  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[81]  There is no evidence in the record of any prior incident of a similar nature that would have placed SMSD on notice that its training was deficient.

Nor does the record present circumstances where the injuries H.C. sustained stemmed from a highly predictable or plainly obvious consequence of SMSD's failure to train its employees.  The Supreme Court has explained "[i]t is not enough to show that more or better training or supervision may have helped avoid the injury."[82]  "The training deficiency must have been the 'moving force behind the injury alleged.'"[83]  In analogous circumstances, the Tenth Circuit has held that even if police officers were inadequately trained to respond to an aggressive suspect, "[t]hey were not trained . . . to shoot [the suspect] repeatedly in the back after he no longer posed a threat."[84]  That court has likewise rejected the theory that sexual assault is a plainly obvious consequence of insufficient training of law enforcement officers.[85]  In this

---

[80] *Waller*, 932 F.3d at 1284 (quoting *Barney*, 143 F.3d at 1307).

[81] *Id.* at 1285 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

[82] *Nation v. Piedmont Indep. Sch. Dist. No. 22*, No. 21-6123, 2022 WL 4075595, at *4 (10th Cir. Sept. 6, 2022) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

[83] *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (internal quotation marks omitted)).

[84] *Carr v. Castle*, 337 F.3d 1221, 1231–32 (10th Cir. 2003).

[85] *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 774 (10th Cir. 2013) ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior.") (quoting *Barney*, 143 F.3d at 1308) (alteration omitted)).

district, Judge Crabtree has extended that rejection to a claim that deputy sheriffs need training to know that they cannot sexually assault high school students.[86]

The Court finds these cases instructive in the school discipline setting.  S.G. makes clear that the only policy on which she claims SMSD failed to train Smith, Cantwell, and Barnard is ESI under the GAAF.  However, S.G. does not identify anything specific in the ESI training— which focuses on whether and how to use appropriate methods of physical restraint of a student—that would have prevented Smith from kicking H.C.  Like the officers in the above cases, no teacher needs training to know that they cannot kick a kindergartner.  This case does not involve a teacher making the wrong call regarding the level of physical restraint to use on a student, or whether to use restraint at all.  Instead, Smith's physical interaction with H.C. was improper under any circumstances.  The record before the Court shows that Smith deliberately kicked H.C.—a terminable offense for which she was charged with criminal battery—which does not present an ESI option that further training would prevent.

Further, assuming that Cantwell and Barnard's conduct rose to the level of a substantive due process violation, the Court finds that S.G.'s failure-to-train claim with respect to them also falls short.  While Cantwell appears to have violated SMSD policy by failing to intervene with Smith and H.C. in the library, S.G. has not explained how further ESI training under the GAAF would have caused Cantwell to anticipate that Smith would commit such an act, especially when her back was to the incident.  Likewise, while Barnard also appears to have violated SMSD policy by sending H.C. back to class, S.G. does not identify how further ESI training would have

---

[86] *Swearingen v. Pleasanton Unified Sch. Dist. 344*, No. 20-2630-DDC-TJJ, 2021 WL 5758544, at *7 (D. Kan. Dec. 3, 2021).

prevented or even addressed the issue of how to proceed when a student reports abuse by a teacher.

Nor do the alleged violations of SMSD's after-the-fact reporting requirements under its ESI policy establish any basis for a failure-to-train claim.  This conduct does not establish the "direct causal link between the municipal action and the deprivation of federal rights."[87]  All of these claims describe actions or failures to act in the wake of the library incident at issue here. "[B]asic princip[le]s of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation."[88]

The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[89]  Here, S.G.'s failure-to-train claim does not present the circumstances required to clear the high bar established for such claims against a municipality.  Accordingly, the Court grants SMSD summary judgment on this claim.

### b.        Failure to Supervise

Assuming that Cantwell's conduct amounted to constitutional violation, the Court turns to S.G.'s claim that Cantwell failed to supervise the interaction between H.C. and Smith so as to protect H.C. while she was in Cantwell's care.  This theory is not premised on an action of SMSD, but instead, on the action of Cantwell, an employee of SMSD.  S.G. does not allege that SMSD failed to supervise Smith appropriately or that Smith acted due to any failure on SMSD's part to supervise her.  Nor does S.G. present evidence that SMSD was on notice that Smith

---

[87] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[88] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1289 (10th Cir. 2019) (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)).

[89] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

needed supervision.  Instead, S.G.'s failure-to-supervise claim mirrors her arguments in her failure-to-train claim—that SMSD failed to train Cantwell on the ESI policy, which the Court has rejected.  Summary judgment is also granted on this claim.

### B.      Kansas Negligence Claim

S.G. contends that SMSD was negligent under the Kansas Tort Claims Act by (1) failing to train and supervise teachers in the proper handling and reporting of situations involving de-escalation, and (2) failing to properly supervise H.C. while in its care.  "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[90]  The Supreme Court has directed district courts to consider "the values of judicial economy, convenience, fairness, and comity."[91]  The Tenth Circuit has instructed courts to consider similar factors.[92]  The decision is committed to the district court's sound discretion.[93]

The Court finds that there are no substantial grounds for jurisdiction over the negligence claim and the state court is in a better position to evaluate S.G.'s claim under state law.[94] Accordingly, the Court declines to exercise supplemental jurisdiction over S.G.'s state-law negligence claim.

---

[90] *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (citing 28 U.S.C. § 1367(c)(3)).

[91] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[92] *See Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.") (citation and internal quotation marks omitted).

[93] *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

[94] *See Nation v. Piedmont Indep. Sch. Dist. No. 22*, No. 21-6123, 2022 WL 4075595, at *8 (10th Cir. Sept. 6, 2022) (reversing district court's judgment for the school district on plaintiff's negligent-investigation claim under the Oklahoma Governmental Tort Claims Act after dismissal of § 1983 failure-to-train and supervise claims).

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 129) is **granted** with respect to Plaintiff's § 1983 claims.  The Court declines to exercise supplemental jurisdiction over the remaining state-law negligence claim.  Therefore, the clerk is instructed to remand the remaining state-law claim to Johnson County District Court.

**IT IS SO ORDERED.**

Dated: January 6, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE